20-1153 from the District of North Dakota, United States v. Rafael Puebla-Zamora. May it please the court... Mr. Escarman. Yes, Your Honor. You're up. May it please the court counsel, my name is... I don't think... Is your camera not turned on? I don't have... I have your circle EE, but there we are. Excellent. I just turned it off and then back on again. Oh, may it please the court counsel, my name is Eric Escarman. I represent Pablo Rafael Zamora. Before you, Your Honor, is an issue on appeal. This is a district court's denial of a motion based on the evidentiary hearing reviewed for abusive discretion while the court's interpretation of law is de novo. Essentially, what had happened in this case is Mr. Puebla-Zamora was living in his apartment. Detective or Officer Branch at the time was a police officer and was looking for a burglar due to some text messages that were sent to him from a confidential informant who had been admitted during the suppression hearing that he had been convicted for lying to the police at some point. He then went to one apartment, 308, and found nothing. They knocked on the door. The burglary wasn't happening. And then once again text messaged his confidential informant. And so he, along with his fellow officer, detective or officer Olsen at the time, went down to apartment 111 where my client Rafael Puebla-Zamora was living. They knocked on the door. They asked him questions of whether he had been there. And essentially they masked it with a story that it was actually a noise complaint. And so after that, no burglary was happening. Obviously there was no break-in. And so at that point, Detective Branch asks for identification from Mr. Puebla-Zamora and then asks him for more identification. Counsel, this is Judge Loken. I'm a little confused as to when you're arguing the unlawful detention occurred. And which officer was responsible for it? A detective branch at that time had asked for the Mexican passport and took a picture of the Mexican passport. And I believe at that point he had already seen the Nevada driver's license. So essentially he was digging for identification. And once he got the Mexican passport, that's through arrest. I understand that. But the conversation with the ICE officer, he was standing in the hall, as I understand it. And your client was inside, willingly talking or, of course, willingly. He wasn't being coerced or told he had to. I don't understand when the detention occurred. After he took a picture of the passport to Border Patrol, Border Patrol initiated the conversation with Detective Branch to detain him. And at that point he arrested Mr. Puebla-Zamora. Where was your client when he was arrested? Inside his apartment, Your Honor. And where was Branch at the time? Right outside the hall. Right. So where's the arrest? I don't understand the physical arrest here. Well, he reached in and then arrested my client. He was asked to detain Mr. Puebla-Zamora. So he reached in and arrested him. Reached in and grabbed him? Cuffed him? What? Yes, Your Honor. Essentially he was arrested at that point. He was arrested, cuffed. No, but how? Physically, how? He just reached into the apartment complex and grabbed my client, Your Honor. He testified to that in the transcript, the trial transcript. If I could just back up, Detective Branch did not testify at trial, but he did testify at the suppression hearing. The text messages, which is another issue I will raise later, were never recovered. They were destroyed because Officer Branch used a private text program associated with the number. And when we tried retrieving those text messages, he admitted in court that the number had been destroyed. All the text messages had been destroyed, and unfortunately we could not get the communication between those two individuals, the confidential informant and Detective Branch. There wasn't a lot of legal research in terms of trying to find text messages between confidential informants and officers, but Judge Linares in the District of New Jersey had made mention that if you can't find all of the text messages, then you can't use any of the text messages essentially as the opinion. And that was between an FBI agent and his confidential informant. And this is the whole beginnings to what had happened to my client. Essentially this officer is going from floor to floor looking for a burglary that didn't happen, and then eventually ends up at my client's front door. This is kind of what precipitated the issue here at that point. Let me ask you about a threshold issue, which is I believe you have to show good cause for not raising a couple of these issues. A pretrial, a timely Rule 12. What do you say to that? Well, Your Honor, the arrest happened in September 4th of 2018. And then on April 29th, 2019, there was a motion for an extension, and that was granted. And then on July 11th, 2019, the motions were heard. So essentially, and I had been third counsel for Mr. Pablo Zamora, and that's part of the issue of delay. He was having problems with his first two defense counsels, and then I was appointed afterwards. And the communication between him and I were a little bit more fluid. And unfortunately, we ended up in a position where the case was continued out until January 14th, 2020, where we eventually had trial. So essentially, my client had been detained this entire time because of the immigration warrant on him after his criminal case. In these cases, generally, individuals who have been arrested for reentry plead guilty. And then they're shipped into Minneapolis for immigration proceedings and then deported back to their home country. But as to my client's... Well, I kind of hear you saying that that is the good cause for not being in the motions. Is that what you're saying? The change of counsel? Yes, Your Honor. Okay, thank you. Proceed. Yes. That being said, the magistrate judge at the time who had made the decision cited a case, United States v. Lonzo Lozano. And essentially, the issue there in no way mirrors the facts in my case. Essentially, Lozano involved a young man, Jasmine Rodriguez Lozano, who was charged with possession with a firearm and ammunition by an illegal alien. And the police officer had responded to a late-night report of suspicious activity involving, quote, two black males walking around, end quote, and encountered Rodriguez Lozano and another man walking in the area. My client wasn't walking out in the street. The Fourth Amendment generally protects individuals, particularly when they're in their own domicile. And essentially, I think that the law cited by the magistrate judge is inapplicable here. Initially, my client was not on the street. There was no search for a person who had reported some kind of suspicious activity. All of these issues were precipitated by these text messages back and forth, which we do not have. This is a communication that generally, when I receive discovery, is added. Is the text message admissible? I don't know. Is it discoverable? Absolutely. And that's one of the issues that I think that Your Honor should address. Counsel, in that regard, I don't understand how Branch being at the door of 111, how it's relevant, how that came about. I don't either, Your Honor. That's a question that was publicly asked. The text messages are neither here nor there on the Fourth Amendment issues, as I see it. Your Honor, I think it has to do with the purpose behind why he was at that front door. I think it would have been helpful for the jury to evaluate those facts for veracity and also for... Now, wait. Your brief argues it was an abuse of discretion to deny suppression based on the text messages. Now you're raising a trial fairness issue, which I don't think is preserved for appeal. No, Your Honor. I would extrapolate that the text messages are important for the case. Unfortunately, they were not available because of the officer's negligence in preserving evidence or potential evidence. In this case, the issue is that they were not preserved. They weren't handed over to defense counsel in either situation, whether it was myself or prior counsel. And essentially, the officer had already admitted on the stand that he had deleted or destroyed those text messages, including all the conversations he had with this quote-unquote confidential informant. We never received his name nor his... As I understand the law, regardless of whether it's Brady or the suppression hearing or any kind of hearing, you have to show what it kind of was and that's kind of important, materiality and what it is. Don't you have that burden if you're griping about not getting it? Yes, Your Honor. It's a huge question of how the officer ended up at my client's front door. What was his intention? Was there really a burglary? He then admits that he makes a noise complaint stop over at 111. The story starts to become more and more convoluted as he testifies. What's the remedy? You're throwing unfair trial arguments that were not preserved into an appeal that raises to suppression hearings. Are you saying that without raising it or putting it in your brief, your client gets a new trial because this wasn't fair? No, Your Honor. Okay, then if it's relevant to a suppression issue, why and what remedy? What gets suppressed because the text messages were lost? The Mexican passport and also a dismissal of the case. Wait a minute. Branch is at the door and when I asked you where was the illegal detention, it was after he was at the door. The argument for suppression was not that Branch shouldn't have been at the door of 111. It's that when Branch got there, what he did after that was unlawful detention. So I can't connect the text messages to the suppression argument. Yes, Your Honor. I understand that they may not be relevant to each other, but the issue is here that the evidence was not, or at least discovery was not available to defense counsel. I just want to reserve some of my time. But where did you preserve that? In my suppression brief. It's not an issue presented for appeal. Yes, Your Honor. I believe I notated both the Arizona case and also the case in New Jersey, the District of New Jersey, in my initial brief and suppression hearing. Where in the District Court record is the argument of the District Court that the government's failure to make available the text messages and discovery should result in what? A new trial? No trial? Dismissal? Punishment of the prosecutor? Where is the District Court given any alert to this as being an appealable issue? Those issues were raised in post-hearing briefs, Your Honor, and those were the citations in the brief. Your Honor, if I could just reserve my last minute of time. Sure. Thank you, Your Honor. Ms. Healy? Good morning. May it please the Court, my name is Megan Healy and I represent the United States in this matter. The United States respectfully asks this Court to affirm the judgment of the District Court. In our brief, the United States outlined multiple paths to affirmance. I don't intend to repeat those arguments here, but I will, of course, answer any questions the Court has. I otherwise intend to spend my time this morning responding to issues that arose during Defense Counsel's arguments. First, I'd like to touch on a couple of factual and record representations that were made during Defense Counsel's arguments. First, he characterizes the arrest that's happening when an officer reaches from the hallway and pulls his client out of the apartment. The factual findings by the District Court in the Report and Recommendation on pages 7 and 8 make clear that the defendant was standing in the hallway with Officer Olson speaking on the phone to a Border Patrol agent who was not in the same city and that he was in the hallway, not handcuffed at the time, and only at the conclusion of that call was he taken into custody. I pardon my ignorance of the basic facts, but was the door open or closed? Your Honor, the door was opened by the defendant, and as the magistrate recognized in her Report and Recommendation, there's nothing in the record that the door was ever closed at any point. Thank you. Proceed. Also, Judge Loken, you referred to an ICE officer being in the hallway, and I just wanted to clarify that point, that the only individuals in the hallway were Officer Olson and Officer Bratcher of the Bismarck Police Department at the outset of this contention. But the phone conversation was with the ICE agent. He wasn't physically present, but the defendant was in the hallway talking to him on the phone. Yes, Your Honor, to a Border Patrol agent. He wasn't in the hallway? Physically in the hallway. Was he grabbed and dragged out in the hallway by Branch? There is nothing in the record to support that characterization. Well, he asked him to come. Counsel, you heard what I said. I have found the finding now. He asked him to step in the hallway, and he did. Right? Yes, Your Honor. Correct. Percy. Counsel, Judge Loken, you asked how these text messages between a drug informant and a police officer are relevant to this inquiry. The text messages provide context, and the confidential informant communication provided context to explain why the officers ended up in front of Apartment 111. That was the point of the officers explaining how they came to be where they were as they were investigating a reported burglary, so that the court understood how they ended up in front of that door. Everything from that point on was a potential encounter, as argued in our brief, as the magistrate judge recommended in her report and recommendation, and as the district court found when it adopted the report and recommendation. I'd also like to note the defense counsel referenced a possible remedy as dismissal of the case. There was no motion to dismiss the case filed in this case. That remedy was never requested at the district court. The only remedy that was requested in the motion to suppress was suppression of evidence flowing from, as was argued, an illegal encounter under the Fourth Amendment. That is what was requested in the motion to suppress. Did the defendant testify at the suppression hearing? The defendant presented no evidence at the suppression hearing. I presented the testimony of four witnesses, both of the officers, Agent Branham, the Border Patrol agent who took the phone call, and then the case agent who testified relevant to the fingerprint booking exception. Thank you. Your Honor, looking over my notes, I believe I've covered the topics that the court brought up. When did this reaching into the apartment occur? Your Honor, the record does not support that characterization that that ever occurred. I certainly didn't get that from the magistrate judge's rather careful summation of what happened. Yes, Your Honor. And her thorough recitation of the facts aligned with the suppression hearing testimony of Officer Bratch and Officer Olson, neither of whom testified that anyone was ever pulled out of their apartment. If the court has no further questions for me, I request respectfully that the court from the judgment of the district court as outlined in the motion. Thank you very much for your time. Very good. Mr. Escaramonte, you have a minute for rebuttal. Yes, Your Honor, and I'd like to correct myself. Yes, he was in the hallway. I am confusing his story with the story of the agent. The agent testified to that fact. There was another individual who was in the apartment. They ended up arresting him as well. The government poses many different arguments. What I'd like to address, at least, is in any event, in the review of the district court's factual determinations for clear and legal conclusions, in at least the Comstock case, the court still pronouncing an alternative holding for the merits after finding suppression issues were waived. And I understand in trial that that might have been an issue. And I would like the court to hold merits over procedure. I believe my time has ended, and thank you very much, Your Honors. Very good, and counsel, the court appreciates your service under the Criminal Justice Act. The case has been effectively briefed and argued, and we will take it under advisement.